# EXHIBIT A

## AFFIDAVIT OF SERVICE THROUGH THE SECRETARY OF STATE

Index #  651398/2018                              Purchased/Filed: March 23, 2018

STATE OF NEW YORK              SUPREME COURT              NEW YORK COUNTY

---

*Interceptor Ignition Interlocks Inc.*                                    Plaintiff

against

*AT&T Mobility Services LLC*                                              Defendant

---

STATE OF NEW YORK
COUNTY OF ALBANY              SS.:

_____ James Perone _____, being duly sworn, deposes and says: deponent is over

the age of eighteen (18) years; that on _____ April 16, 2018 _____, at _11:45am_, at the office of the

Secretary of State of the State of New York in the City of Albany, New York deponent served the annexed

Notice of Electronic Filing with Summons and Verified Complaint

on

_____ AT&T Mobility Services LLC _____, the

Defendant in this action, by delivering to and leaving with _____ Sue Zouky _____,

AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the

Office of the Secretary of State of the State of New York, _2_ true copies thereof and that at the time

of making such service, deponent paid said Secretary of State a fee of _40_ dollars; That said service

was made pursuant to Section _303 Limited Liability Company Law_.

Deponent further says that deponent knew the person so served as aforesaid to be the agent in the Office

of the Secretary of State of the State of New York, duly authorized to accept such service on behalf of said

defendant.

Description of the person served:  Approx. Age: _55-60_    Approx. Wt: _125lbs_    Approx. Ht: _5'1_

Color of skin: _White_    Hair color: _Red/Blonde_    Sex: _Female_    Other: _____

Sworn to before me on this

_16th_  day of _____ April, 2018 _____

SCOTT SCHUSTER
NOTARY PUBLIC, State of New York
NO. 01SC6308636, Albany County
Commission Expires July 28, 2018

_____
James Perone
**Attny's File No.**
Invoice•Work Order # SP1805113

INDEX NO. 651398/2018
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 05/09/2018

DOS-1246 (02/12)

**DEPARTMENT OF STATE**
DIVISION OF CORPORATIONS
STATE RECORDS AND UCC
99 WASHINGTON AVENUE
ALBANY, NY 12231-0001



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**USPS CERTIFIED MAIL**

USPS CERTIFIED MAIL

9214 8969 0059 7938 0181 83

201804180951
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK NY, 10011



US POSTAGE>>PITNEY BOWES

ZIP 12231
02 1W
0001391831 APR 20 201

$ 005.71

State of New York - Department of State
Division of Corporations

Party Served:                           Plaintiff/Petitioner:
 AT&T MOBILITY SERVICES LLC              INTERCEPTOR IGNITION
                                         INTERLOCKS INC.


C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK,  NY 10011


Dear Sir/Madam:
Enclosed herewith is a legal document which was served upon the Secretary of
State on 04/16/2018 pursuant to SECTION 303 OF THE LIMITED LIABILITY COMPANY
LAW.  This copy is being transmitted pursuant to such statute to the address
provided for such purpose.


                                         Very truly yours,
                                      Division of Corporations

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

INTERCEPTOR IGNITION INTERLOCKS INC.,

Plaintiff,

- against -

AT&T MOBILITY SERVICES LLC,

Defendants.

---

Index No.: 651398/2018

**SUMMONS**

Date Index No. Purchased:
March 23, 2018



TO THE ABOVE-NAMED DEFENDANTS:

AT&T MOBILITY SERVICES LLC
77 Water Street, New York, New York

Registered Agent:
C/O C T Corporation Systems
111 Eighth Avenue
New York, NY 10011

     YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer or, if the complaint is not served with this summons, to serve a notice of appearance on the plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of the venue designated is defendant's principal place of business / residence which is located at 77 Water Street, New York, New York.

Dated: New York, New York
       March 23, 2018

        **O'REILLY STOUTENBURG RICHARDS LLP**
        32 East 57th Street, 8th Floor
        New York, NY 10022
        T: (212) 419-9880
        F: (212) 812-3328
        mark@osrlaw.com

        By: _____
            Mark W. Stoutenburg

        *Attorneys for Plaintiff*

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM   INDEX NO. 651398/2018

NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 03/23/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

INTERCEPTOR IGNITION
INTERLOCKS INC.,

           Plaintiff,

      - against -

AT&T MOBILITY SERVICES LLC,

           Defendants.

Index No.

**Verified Complaint**

       Plaintiff Interceptor Ignition Interlocks Inc. ("Interceptor"), by way of a Verified

Complaint against Defendants AT&T Mobility Services LLC ("AT&T") states:

## NATURE OF THE CLAIM

      1.    Plaintiff Interceptor, a nationally recognized company that provided an

innovative and state-of-the art ignition interlock solution to help prevent drunk driving,

brings this action against AT&T because it improperly terminated the wireless

telecommunication services it provided to Plaintiff Interceptor.  Plaintiff Interceptor

deployed the wireless services in connection with its patented automobile ignition interlock

device for individuals under the supervision of state law enforcement agencies.  Plaintiff's

ignition interlock device provided real time alerts to law enforcement agencies concerning

an operator's attempts to operate a vehicle while intoxicated, allowed real time geographic

positioning data, and offered instant photographic evidence of the vehicle operator.  To

enable this functionality, Plaintiff Interceptor contracted with AT&T to provide "subscriber

1

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

identification module cards" ("SIM cards") and wireless telecommunication services (collectively the "Services"), which were incorporated into a wireless modem connected to Plaintiff's ignition interlock devices. Each individual ignition interlock device required a single AT&T wireless connection and was assigned a unique data line through its AT&T SIM card and corresponding telephone number assigned by AT&T. The AT&T lines were for data only, and did not carry voice, SMS or other telecommunication services.

2.     Beginning in 2004, AT&T provided Plaintiff Interceptor with a single line for a single device, but within a few years, as Plaintiff Interceptor perfected its solution and its business grew, it ordered thousands of lines from AT&T for use in thousands of ignition interlock devices. Plaintiff Interceptor initially provided this solution to parolees and probationers under the supervision of New York State, pursuant to its contract with the State, and eventually expanded into 14 other states. As Plaintiff Interceptor's business expanded over the following years and it ordered additional Services AT&T, repeatedly overbilled Plaintiff Interceptor for the Services and sent Plaintiff invoices that were plainly erroneous and which claimed massive overcharges (as later acknowledged repeatedly by AT&T). Plaintiff Interceptor diligently and repeatedly disputed the overcharges and was extremely patient with AT&T in trying to resolve AT&T's continuous overbilling and issuance of erroneous invoices. Nevertheless, in 2011, shortly after issuing a credit to Plaintiff Interceptor and promising to solve the ongoing billing problems, AT&T – without notice and without justification – terminated Services to Plaintiff Interceptor, under the pretext that Plaintiff failed to pay charges that AT&T claimed were outstanding. This

2

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

outstanding amount "past due" was actually a product of AT&T's erroneous and fictitious overbilling, and not legitimate charges for the Services.

3.      AT&T's improper termination of Services resulted in immediate and substantial damages to Plaintiff Interceptor. Without the wireless connectivity provided by AT&T, a critical functionality of the ignition interlock solution was disabled for at least 700 individuals who were required by law enforcement agencies to have an ignition interlock installed in their automobile as a condition of their parole or probation. This loss of functionality, AT&T's false claims that Plaintiff Interceptor was in arrears, and the ensuing risk to the public at large, caused the New York State Division of Criminal Justice Services to suspend and then terminate Plaintiff's Interceptor's contract with the State. Subsequently, as a direct and proximate cause of AT&T's termination and false claims that Plaintiff Interceptor was in arrears, the New York State Department of Health de-certified Plaintiff's ignition interlock solution. Ultimately, as a direct and proximate cause of AT&T's improper termination of Services, Plaintiff Interceptor suffered the destruction and total loss of its business. This action seeks to recover actual and compensatory damages, special and consequential damages (including lost profits), for AT&T's erroneous and fictitious billing and its improper termination of Services to Plaintiff Interceptor.

## JURISDICTION AND VENUE

4.      This Court may exercise personal jurisdiction over Defendant pursuant to CPLR §§ 301 and 302. Among other reasons, Defendant transacted business within New York, including New York County, in conjunction with the provision of the Services.

3

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

5.      Venue is proper pursuant to CPLR § 503 because Defendant's principal place of business in New York is located in New York County at 77 Water Street, New York, New York.

### PARTIES

6.      Plaintiff Interceptor, a corporation formed under the laws of the State of New York, was formerly known as Safe Start Inc. and changed its name to Interceptor Ignition Interlocks Inc. in 2006.

7.      Defendant AT&T Mobility Services LLC, formerly known as Cingular Wireless Employee Services, LLC, and the successor to AT&T Wireless Services, Inc., is a Delaware limited liability company authorized to transact business in the State of New York.

### FACTS

**A.      Plaintiff Interceptor Develops Its Patented Ignition Interlock Solution**

8.      Plaintiff Interceptor (then known as Safe Start Inc.) began operations in 2000 to design and manufacture ignition interlock devices.  Conventional ignition interlock devices required the vehicle operator to take a Breathalyzer test before starting the automobile.  If the device detected elevated breath alcohol content levels in the operator, it prevented the automobile from starting and internally logged a failed attempt to start the vehicle.  In New York State, ignition interlock devices of this type were required as a condition of parole or probation to individuals who were convicted of driving while under the influence of alcohol, pursuant to section 1198 of the New York State Vehicle and Traffic Law.  Other states have similar laws regulating the use of ignition interlock devices.

4

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

Typically, the individual would lease the ignition interlock device from the manufacturer and pay a separate installation and maintenance fee to an installer authorized by the manufacturer to install and maintain the device. In New York State, the manufacturers of ignition interlock devices are overseen by the New York State Division of Criminal Justice Services and the devices themselves are certified by the New York State Department of Health ("DOH") under section 1198 of the New York Vehicle and Traffic Law and associated regulations.

9.   Conventional ignition interlock devices suffered from several drawbacks. First, an intoxicated operator could circumvent the device by having a person with normal breath alcohol content take the breathalyzer test. Second, an operator could take the breathalyzer while sober, start the vehicle and allow it to run, and operate the vehicle later after becoming intoxicated. Third, failed attempts to operate the vehicle while intoxicated (a "Violation") would only be detected by law enforcement months later when the device data was downloaded or physically inspected. Fourth, there was no evidence of which individual took the breathalyzer, so if there was a Violation the operator could claim it was another person. The absence of a method enabling direct law enforcement intervention in the event of a Violation significantly undermined the efficacy of conventional ignition interlock devices, leading judges and probation officers to lack confidence in the technology.

10.   From 2000 through 2004, Plaintiff Interceptor worked to develop an innovative solution to address these problems. It designed an ignition interlock device with wireless connectivity to allow real-time data, photos and GPS information to be transmitted

5

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM   INDEX NO. 651398/2018
NYSCEF DOC. NO. 1   RECEIVED NYSCEF: 03/23/2018

to Plaintiff Interceptor and, ultimately, to law enforcement agencies, 24 hours a day, 7 days a week. This functionality allowed the ignition interlock to immediately notify law enforcement of a Violation, and transmitted a photo of the operator and the GPS coordinates of the vehicle to law enforcement. In addition, the interlock device transmitted photos of the person taking the breathalyzer even with successful attempts to operate, allowing law enforcement to determine if someone else was using the device. Third, the interlock device required an operator to periodically take the breathalyzer during the operation of the vehicle, and would immediately notify law enforcement of any Violations together with the location of the vehicle. This monitoring was provided continuously by Plaintiff Interceptor, and also to law enforcement agencies through its proprietary computer systems.

11.     Plaintiff Interceptor branded this ignition interlock solution – which incorporated wireless connectivity and real-time reporting to law enforcement – the Safe Start Model M-1 Ignition Interlock Device (the "Interlock"). In May 2004, the DOH certified the Interlock as compliant with all of the requirements of 10 NYCRR Part 59, pursuant to its authority under Section 1198 of the New York State Vehicle and Traffic Law. The Interlock was subsequently approved for use in several other states.

12.     In November 2004, the principals of Plaintiff Interceptor applied for a United States patent for the Interlock and on August 14, 2007, Patent No. US 7,256,700 B1 was issued to them as inventors and assigned to Plaintiff Interceptor.

13.     In June 2010, Plaintiff Interceptor executed a contract (contract number C523276) with the New York State through its Division of Probation and Correctional

6

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

Alternatives to provide ignition interlock program services throughout the State for period of August 15, 2010 to August 14, 2013.

**B.**     **Plaintiff Interceptor Obtains Services from AT&T**

14.     In 2004, Plaintiff Interceptor began to purchase Services from AT&T Wireless Services, Inc. ("AWS") for use with the Interlocks. Under the plan subscribed to by Plaintiff Interceptor, AWS charged a flat fee of $11.99 per month for each line for up to one megabyte of data ("1MB"), inclusive of "monthly usage," "charges" and "taxes, surcharges & regulatory fees." This plan was sold to Plaintiff Interceptor by AWS as the "Pooled Data Plan 1MB" which permitted the sharing (or pooling) of the 1MB data across all lines on the account. Thus, AWS agreed to provide the Services and Plaintiff Interceptor agreed to pay $11.99 per month, inclusive of all fees and charges. No written contract was ever signed by the parties relating to the agreement to provide the Services, but the parties' course of conduct, their communications, AT&T internal documents and AWS invoices issued in 2004 confirm that this was the agreement of the parties.

15.     Each individual Interlock required a single AT&T wireless connection and SIM card and was assigned a unique line with a corresponding telephone number by AT&T. During 2004, as Plaintiff Interceptor rolled out the production and sale of the Interlock, AWS correctly invoiced it a flat fee of $11.99 per line for 1MB of Services.

16.     Upon information and belief, in late 2004, AWS was acquired, directly or indirectly, by Cingular Wireless Employee Services, LLC ("Cingular"). In December 2004, Plaintiff Interceptor received an invoice stating that "AT&T Wireless is now part of Cingular Wireless" and, the logos of both Cingular and AWS were reflected on the invoice.

7

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

The December 2004 invoice issued to Plaintiff Interceptor correctly reflected the flat fee of $11.99 per line for 1MB of Service.

17.     However, beginning with the January 2005 invoice, after the Cingular acquisition, Plaintiff Interceptor began to receive erroneous invoices from AWS/Cingular. There were two primary types of overcharges by AWS/Cingular: (1) charges for Services for lines in excess of the number of active lines ordered by Plaintiff Interceptor, and (2) charges for Services that exceeded the rate plan subscribed to by Plaintiff Interceptor. For example, in January 2005 alone, AWS/Cingular invoiced Plaintiff Interceptor for nine lines that were not active. This overcharging for excess lines not ordered by Plaintiff Interceptor continued for the remainder of Plaintiff's relationship with AT&T. In addition, AWS/Cingular began to separately charge for text messaging, photos (multi-media messaging), mMode, and tethering (data transfer through the phone), even though these had previously been included in the Services provided for the flat rate of $11.99 per month. For example, beginning in January 2005, AWS/Cingular invoices began to include amounts for "Charges" and "Monthly Usage" above and beyond the $11.99 flat fee plan it had previously provided for the Services. These improper charges for Services that should have been included in the flat rate plan subscribed to by Plaintiff Interceptor continued for the lifetime of its relationship with AT&T.

18.     In 2005, AWS/Cingular issued monthly invoices to Plaintiff Interceptor totaling $4,051.20 for Services. The correct amount due was $1,845.97. Thus, in 2005 Plaintiff Interceptor was overcharged by AWS/Cingular in the amount of $2,205.23 for the Services. On August 27, 2005, after receiving several monthly invoices with erroneous

8

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

billing, Plaintiff's CEO John Ruocco wrote to Scott Horman at Cingular: "At this time, I

know it is the best interest of [Plaintiff] to stick with the original "Pooled Data Plan" as

sold to us by AT&T, which our entire technology and business was established around, and

our pricing was implemented upon. . . . My only interest at this time is to continue the

original plan. ALMOST EXACTLY AS IT WAS FIRST SOLD TO ME BY AT&T, and

that is the "Pooled Data Plan," which includes one mega byte of date per line per month,

for $11.99 each line, with no additional charge . . ." Upon information and belief,

AWS/Cingular issued Plaintiff Interceptor a small credit and claimed it would make

internal changes to Plaintiff Interceptor's rate plan to ensure it would receive the correct

invoicing for Services. This did not happen.

19.    The billing errors and overcharges by AWS/Cingular continued unabated for

the next six years. In 2006, AWS/Cingular issued monthly invoices to Plaintiff Interceptor

totaling in excess of $10,000 for the Services. The precise amount AWS/Cingular was

claiming was due is unclear, since during February through June 2006, AWS/Cingular

issued two invoices for each month, with inconsistent amounts it claimed was due. The

correct amount due by Plaintiff Interceptor was $3,851.26. Thus, in 2006 Plaintiff

Interceptor was overcharged by AWS/Cingular by at least $7,000 for the Services. Plaintiff

Interceptor made payments to AWS/Cingular in 2006 totaling $5,991.32, and so it actually

overpaid for the Services during that year in the amount of $2,098.43.

20.    In January 2007, upon information and belief, Cingular was rebranded as

AT&T. Plaintiff began to receive invoices in March 2007 stating that Cingular had

changed its name to AT&T. Upon information and belief, in filings with the New York

9

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

State Secretary of State in which it sought authority to transact business as a foreign limited liability company, Cingular changed its name to AT&T Mobility Services LLC, the defendant herein.

21.     In or about March 2007, Plaintiff Interceptor was informed by AT&T via a "ServiceGram" that effective with the next billing cycle it would receive "more included data usage per month – for the same low monthly cost." According to the notice, Plaintiff Interceptor would receive 2MB of data for a monthly recurring charge of $11.99 per line (an increase from 1MB per line). This increased data cap was reflected in the April 2007 invoice from AT&T.

22.     In 2007, AT&T continued to issue invoices to Plaintiff Interceptor that were erroneous and that included excessive and incorrect charges for the Services. In 2007, AT&T issued monthly invoices to Plaintiff Interceptor totaling $19,344.91 for the Services. The correct amount due was $8,092.52 and thus AT&T overbilled Plaintiff Interceptor in the amount of $11,252.39. Plaintiff Interceptor made payments to AT&T in 2007 totaling $8,670.40, and so it actually overpaid for the Services in the amount of $468.53.

23.     At the end of 2007, Plaintiff's CEO John Ruocco filed new disputes with AT&T in effort to address the erroneous invoices issued by AT&T. In response to these claims, AT&T reviewed Plaintiff's account, data usage and invoices. AT&T's internal documents from this review confirmed that Plaintiff Interceptor had been the victim of erroneous and fraudulent billing practices. In January 2008, an AT&T report stated that "This customer has all SIM cards only for 11.99 2mb telemetry plans. He has been charged for more than he is actually using. . . .They are being charged for text messages which can

10

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

not [sic] be on these SIM cards since they are in modems." Further the AT&T internal

reports states: "incorrect charges on bill for numbers not active nor being used and data

charges that can not [sic] be valid due to the nature of the device." Mr. Ruocco repeatedly

provided detailed information to AT&T in the first few months of 2008 concerning Plaintiff

Interceptor's account and the correct charges for the Services.

24.    AT&T, however, continued to invoice Plaintiff Interceptor incorrectly for the

Services.  For example, as of the invoice for the billing period ending April 25, 2008,

AT&T claimed Plaintiff Interceptor owed $20,498.42 in charges for past and current

Services, even though this amount was fictitious and the product of erroneous invoicing by

AT&T.

25.    As a result of the disputes lodged by Plaintiff Interceptor, AT&T issued a

credit to Plaintiff Interceptor for $20,095.93 (reflected on the AT&T invoice for the billing

period ending May 25, 2008).  This credit was due to the intervention of Melissa Donovan

of AT&T's Executive Escalation Response team.  According to an AT&T report entitled

"Clarify Case Number: CM20080429_2881818," that she prepared, the root cause of the

incorrect invoicing by AT&T was its billing for lines that were improperly activated by a

sales agent "no longer employed by our sales team."  Upon information and belief, the sales

agent fraudulently activated lines on Plaintiff's account that it did not order, so that the

agent could meet sales quotas and increase his compensation.  In addition, Ms. Donovan

determined that Plaintiff Interceptor had been invoiced for "erroneous Early Termination

Fees" after it was instructed by AT&T to cancel the improperly activated lines.  The April

2008 credit reduced AT&T's claim for fictitious amounts it claimed were past due for the

11

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

Services, but it did nothing to address the repeated and systemic overbilling by AT&T for the Services.

26.     In total, during 2008 AT&T issued monthly invoices to Plaintiff Interceptor in the amount of $32,977.22 for the Services. The correct amount due for the year was $18,590.69, and thus AT&T overbilled Plaintiff in the amount of $14,386.53. Plaintiff Interceptor made payments to AT&T in 2008 totaling $18,590.69, and so it actually overpaid AT&T in 2008 in the amount of $4,438.54.

27.     As before, the two main sources of overbilling by AT&T was its billing for lines that were not ordered or activated by Plaintiff Interceptor and its billing for fictitious "usage" charges that were incorrectly added onto the flat fee of $11.99 per line per month plan that Plaintiff Interceptor subscribed to. For example, in 2008 AT&T invoiced Plaintiff for 1,740 lines, even though only 1,534 were ordered to be activated. In 2009, AT&T invoiced Plaintiff for 4,803 lines, even though only 3,348 were ordered to be activated.

28.     In 2009, a new issue with AT&T's billing caused erroneous invoices to be sent to Plaintiff Interceptor. Plaintiff's "Pooled Data Plan" permitted the sharing of data usage across all of Plaintiff's lines. In other words, if a single line exceeded 2MB of data usage in one month, Plaintiff would not be charged for an overage unless the total usage for all of Plaintiff's lines exceeded 2MB per month. This was a key feature of the "pooled" plan subscribed to by Plaintiff Interceptor. Nevertheless, AT&T began charging for overages when a single line exceeded 2MB of data usage, even though the plan permitted the pooling of data across lines.

12

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

29.    Plaintiff Interceptor diligently filed disputes and sought a credit for the incorrect invoicing.  In March 2009, internal AT&T documents seeking management approval for a credit stated: "This customer is on all 2 MB Telemetry Pooling plans and consistantly [sic] getting charged for overages.  This is happening monthly.  Customer is always receiving overage charges when never going over the total pooled MB allowance." An April 2009 credit adjustment request to AT&T management (an internal AT&T document) stated: "Customer is on all 2MB pooled telemetry plans with proprietary modems installed in vehicles.  They are consistently being charged for overages and TM charges."  Likewise, a May 2009 credit adjustment request to AT&T management (an internal AT&T document) stated: "This customer is on all 2mb pooled telemetry plans and has incurred overages when the group total is way under."  Plaintiff Interceptor received the following credits in 2009 for the disputes it filed with AT&T: March 2009 credit of $555.46, May 2009 credit of $546.79, June 2009 credit of $654.15, July 2009 credit of $1200 and $536.35, and September 2009 credit of $861.52 and $610.53.

30.    In total during 2009, AT&T issued monthly invoices to Plaintiff Interceptor for Services in the amount of $67,150.67.  The correct amount due was $39,245.80, and thus AT&T overbilled Plaintiff in the amount of $27,904.87.  Plaintiff Interceptor made payments to AT&T in 2009 totaling $48,357.47, and so it actually overpaid AT&T in 2009 in the amount of $9,111.67.

31.    Plaintiff Interceptor's business expanded significantly in 2010 under its contract with the State.  Accordingly, it ordered substantially more lines from AT&T during this year.  In 2010, Plaintiff Interceptor ordered the activation of a total of 5,967

13

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

lines (or approximately 500 lines per month). AT&T's historic practice of erroneous and fictitious billing continued, but with the increased volume of lines, the monetary value of its errors and incorrect invoices was now substantially larger.

32.     Because of AT&T's continuous billing errors, in 2010 Plaintiff Interceptor diligently filed disputes and sought credits for the overcharges, while making monthly payments for the amounts it calculated were due or which its sales representative advised it to pay. AT&T internal documents again confirm that Plaintiff Interceptor was being billed incorrectly. In a May 2010 credit request document, AT&T's representative states: "Since the beginning of the year [2010] this customer's bill has not reflected correctly. There was an account review but the balance was still not correct. In order to correct the customer had made several payments to become current but the balance is not correct. I have reached out to KCC and was told they can not [sic] assist as this is an off-line assist and recommended Red Team." Upon information and belief, the "Red Team" was a special AT&T unit designated to handle customer disputes.

33.     In November 2010, internal AT&T documents confirm that Plaintiff Interceptor was, once again, being overcharged for calls and text messages, charges that were not possible given how the Services were integrated into the ignition interlock devices. In an AT&T internal memo from November 2010, AT&T's representative stated: "This customer has all 2MB pooled telemetry plans. Last month their bill was at zero after payment. No changes were made to the account with regards to plans nor did the customer change the way they have been using their data. These are all in modems in vehicles and are unable to make calls or do text messaging. The mobile number [REDACTED] has

14

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

$2,572.48 in text messaging and as stated above it is not able to since it is in a modem in a vehicle."

34.    All of Plaintiff Interceptor's claims for overcharges were legitimate and, accordingly, AT&T issued credits for its mistakes.  Upon information and belief, Plaintiff Interceptor received the following credits from AT&T during 2010 in response to the disputes it filed:  January 2010 credit of $3,090.72,  March  2010 credit of $2,887.54, July 2010 credit of $2,450, August 2010 credit of $8,499, September 2010 credit of $5,050, October 2010 credit of $5,000, November 2010 credit of $9,900, and December 2010 credit of $9,359.20.

35.    In total during 2010, AT&T issued monthly invoices to Plaintiff Interceptor for Services in the amount of $212,423.85.  The correct amount due was $71,293.51, and thus AT&T overbilled Plaintiff in the amount of $141,130.34.

36.    In 2011, Plaintiff Interceptor's business continued to grow and expand and it ordered the activation of additional lines from AT&T; during this year it ordered the activation of a total of 12,508 lines (or approximately 1,000 lines per month).   However, AT&T continued to issue erroneous invoices with charges that exceeded Plaintiff Interceptor's Pooled Data Plan and invoiced Plaintiff Interceptor for lines that it did not order or activate.  In 2011 alone, AT&T billed Plaintiff Interceptor for 5,468 lines that it did not order for activation.

37.    In March 2011, a new issue emerged which caused AT&T to issue erroneous invoices to Plaintiff Interceptor.  According to AT&T documents from March 2011, AT&T's provisioning of its SIM cards that were installed in a new model of modem that

15

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

Plaintiff Interceptor had purchased at the direction of AT&T was causing excessive data charges.  AT&T's provisioning of the newly purchased "Sierra" wireless modems caused "higher data usage that the previous modems being used" as determined by AT&T Systems Engineer Aaron Johnson.  This provisioning issue caused Plaintiff Interceptor's data usage to triple each month for a period of at least four months.  According to AT&T documents, Plaintiff Interceptor had been using a "Multitech" modem until a new "Sierra" modem was recommended by Mr. Johnson.  The memo, which was prepared in support of a credit request to management, states: "Approximately 4 months ago, in November, 2010, their bill tripled when it was constant at the MRC for the pooled 2MB telemetry multiplied by the number of active SIM cards . . .  Future credits will most likely be requested, until all the units can either be replaced or re-provisioned."  Although a credit of $136,396.83 was requested, Plaintiff Interceptor did not receive a credit for this amount at this time.

38.    In June 2011, Plaintiff's representative at AT&T recommended that Plaintiff Interceptor move to an Enterprise on Demand ("EOD") model.  According to AT&T's June 20, 2011 letter, this would allow Plaintiff Interceptor "complete control over all [its] activations as well as discount the price even further . . . . In addition, EOD will allow you to cancel lines when needed with no penalties or termination fees."  Under the AT&T proposal, Plaintiff Interceptor would place one last order for 100 lines under the Pooled Data Plan before moving to the EOD platform.

39.    Consistent with AT&T's representations, on August 17, 2011, Plaintiff Interceptor and AT&T executed the "AT&T Machine to Machine Wireless Communications Agreement."  This agreement provided for 25MB of data for $9.99 per

16

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

month per line, a significant savings over the existing Pooled Data Plan subscribed to by Plaintiff Interceptor. However, Plaintiff Interceptor never received any wireless services from AT&T pursuant to this agreement, and for the remainder of its relationship with AT&T it stayed on the existing Pooled Data Plan for the Services. Upon information and belief, AT&T did not migrate Plaintiff Interceptor to the EOD platform because of its various technical problems and bureaucratic delays.

40.      In the meantime, Plaintiff Interceptor continued to seek a substantial credit for the massive overcharges it was incurring from AT&T, charges that AT&T acknowledged were completely in error. As of the invoice for the billing period ending August 25, 2011, AT&T claimed that Plaintiff Interceptor owed $658,426.14 for the Services, with a past due amount of $563,364.15. As described above, the past due amount was fictitious, because it was based on billing for lines that Plaintiff Interceptor never ordered or activated, for usage and other charges it did not incur, and for AT&T's faulty provisioning of its SIM cards (as discussed above) which were causing excessive data charges. These mistakes and errors, and AT&T's incorrect invoicing, were repeatedly acknowledged by AT&T.

41.      Accordingly, in response to the billing disputes raised by Plaintiff Interceptor, AT&T proposed that Plaintiff Interceptor be issued a credit of $517,455.23 to resolve AT&T's billing errors for the period of November 3, 2010 to August 3, 2011. Upon information and belief this credit was proposed with the approval of Regan Ladisic-Haines, an AT&T Regional Vice President. Effectively, this credit would clean the slate and eliminate the past due balance that existed as of the invoice for the billing period ending

17

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

August 25, 2011. Ultimately, the parties executed the "Release and Settlement Agreement" dated as of October 20, 2011, which provided for a credit to Plaintiff Interceptor in the amount of $517,455.23 for the period of November 3, 2010 to August 3, 2011. AT&T eventually applied this credit to the invoice it issued to Plaintiff Interceptor for the billing period ending December 25, 2011.

42.     Regrettably, after the period covered by the Release and Settlement Agreement, AT&T continued to issue fictitious and erroneous invoices to Plaintiff Interceptor:

- For the billing period ending August 25, 2011, AT&T's invoice claimed "current charges" due of $95,061.99. The correct amount due was only $11,438.46.

- For the billing period ending September 25, 2011, AT&T's invoice claimed "current charges" due of $128,940.62. The correct amount due was only $12,800.52.

- For the billing period ending October 25, 2011, AT&T's invoice claimed "current charges" due of $73,646.98. The correct amount due was only $13,592.24.

- For the billing period ending November 25, 2011, AT&T's invoice claimed "current charges" due of $32,873.64. The correct amount due was only $14,882.94.

18

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

- For the billing period ending December 25, 2011, AT&T's invoice claimed "current charges" due of $65,514.28. The correct amount due was only $14,270.07.

43.  Accordingly, for the billing periods ending August 25, 2011 through December 25, 2011, AT&T invoices stated that the amount due for the Services totaled $396,037.51. The correct amount due by Plaintiff Interceptor for the Services for this period was actually $66,984.23. For this period alone then (which post-dated the effective dates of the Release and Settlement Agreement) AT&T's invoices reflected overbilling to Plaintiff Interceptor of at least $329,053.28.

44.  In total during 2011, AT&T issued monthly invoices to Plaintiff Interceptor for Services in the amount of $950,531.15. The correct amount due was only $146,669.10, and thus AT&T overbilled Plaintiff in the amount of $803,862.05. During 2011, Plaintiff Interceptor made payments to AT&T totaling $174,000.00, and so it overpaid AT&T for the Services in the amount of $27,330.90.

45.  In November 2011, shortly after executing the Release and Settlement Agreement, Plaintiff Interceptor's CEO John Ruocco was contacted by an in-house debt collector from AT&T, Michelle Davis. According to her email: "I wanted to inform you that the account listed above is at a balance of $841.013.74. At this time there is a pending credit in the amount of $517,455.23. This would leave an outstanding balance due of $323,558.51. We need a payment in this amount to post to continue to hold collection activity on your account."

19

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

46.     After receiving this email, Mr. Ruocco was understandably upset and frustrated. He immediately wrote to AT&T's Regan Ladisic-Haines: "I received the email . . . from Michelle Davis, and I am quite perplexed at the context. I believe there is still no resolution on AT&T's side . . . I have been quite patient with all of the erroneous billing issues associated with Interceptor's account. Frankly I am shocked that it happened in the first place, since we did not ever request a rate change, rather one was imposed upon us. . . . I am formally requesting that our account has the correct provisioning, and that we are moving forward with the new data plan that AT&T has established for us. According to the e-mail below, that is not the case. As I stated before, my financials are paramount to receiving funding, and the erroneous balances are simply not going to work for us. I will be happy to pay any amount due, that is adjusted to the new rate plan that you have established for us on 8/17/11 on the AT&T Machine to Machine EOD Service Plan (Monthly charge $9.99 for 25,000 KB, Pooled), and back dated to where it should be."

47.     AT&T refused Plaintiff Interceptor's request to correct the continuing erroneous billing errors or to adjust the past due balance to reflect the actual charges Plaintiff Interceptor should have been invoiced under the existing Pooled Data Plan. AT&T also refused Plaintiff Interceptor's request to re-rate the Services under the terms of the AT&T Machine to Machine EOD Service Plan. AT&T never provided any services to Plaintiff Interceptor under the AT&T Machine to Machine EOD Service Plan.

48.     In February 2012, Mr. Ruocco and AT&T's Regan Ladisic-Haines exchanged a series of emails concerning Plaintiff Interceptor's alleged "past due balance" for the period of July 2011 through December 2011. AT&T's Regan Ladisic-Haines claimed that

20

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

the amount due from Plaintiff Interceptor for the Services for that billing period was $392,464.87. As detailed above, this amount claimed by AT&T grossly overstated the charges due for the Services, and represented charges that far exceeded the Pooled Data Plan rate that Plaintiff had subscribed to for years. The fictitious "past due amount" claimed by Regan Ladisic-Haines was yet another example of AT&T's erroneous billing and was primarily attributable to the incorrect provisioning of AT&T's SIM cards (as detailed above). Nevertheless, AT&T's Regan Ladisic-Haines demanded an immediate payment plan to deal with the "past due amount."

49.     In response, Mr. Ruocco noted that the amount claimed due of $392,464.87 were "ridiculous charges" and pointed out that the erroneous charges were the product of AT&T's incorrect provisioning of AT&T's SIM cards. He requested that AT&T come up with a proposal to address the ongoing problem. In an email he wrote: "We are still unclear on how this got out of hand, other than the fact that we were on the wrong provisioning plan, and once that happened we could no longer be billed at the original rate."

50.     Without notice to Plaintiff Interceptor, AT&T suspended the Services on March 27, 2012. On April 10, 2012, Mr. Ruocco emailed AT&T's Regan Ladisic-Haines: "I have been trying to contact you for several days, please advise the date Interceptor's service was suspended, we have approximately 700 + modems that are not transmitting on the Probation site, and the 911 Emergency Response Program. We must have the date our service was discontinued by AT&T." AT&T responded by email that it suspended the Services on March 27, 2012.

21

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

51.    AT&T's suspension of the Services, without notice and based on its incorrect and erroneous invoicing, was a violation of the parties' agreement and the terms of Plaintiff's subscription to the Pooled Data Plan.  AT&T's suspension of the Services was reckless and evidenced its gross disregard for public safety, since it knew the Services were deployed in connection with ignition interlock devices that served to protect the public and prevent drunk driving.

52.    Even though AT&T suspended the Services on March 27, 2012, it continued to invoice Plaintiff Interceptor for the Services.  For the billing period ending April 25, 2012, AT&T invoiced Plaintiff Interceptor $23,558.28 for "current charges."  The same invoice claimed the total past due balance was $570,832.47.  In total during 2012, AT&T issued monthly invoices to Plaintiff Interceptor for Services in the amount of $209,142.96. The correct amount due was only $39,260.36, and thus AT&T overbilled Plaintiff in the amount of $169,882.60.

**C.    Plaintiff's Business is Destroyed Due to AT&T's Termination of the Services**

53.    New York State suspended Plaintiff Interceptor's contract with the State on June 26, 2012.  The State's suspension was directly due to the loss of wireless connectivity of the Interlock devices provided by Plaintiff Interceptor and was a direct and proximate result of AT&T's improper termination of the Services.  Effective on that date, Plaintiff Interceptor was suspended from conducting new sales and installation of ignition interlock devices in New York State.

54.    In December 2012, the New York State Division of Criminal Justice Services' Office of Internal Audit and Compliance (the "Division") initiated an audit of

22

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

Plaintiff Interceptor's compliance with the terms of its contract with the State.  As part of the audit the Division requested copies of all AT&T invoices dating to 2010 and made several inquiries about the amounts reflected as "past due" in AT&T's final invoice to Plaintiff Interceptor.   Plaintiff Interceptor repeatedly explained to the Division that it disputed that the amount of $570,832.47 that AT&T claimed was "past due" in its final invoice for the period ending April 25, 2012.  Plaintiff Interceptor noted that this was a fictitious invoice amount that did not reflect legitimate charges by AT&T for the Services and that it was a result of AT&T's systemic and historic overbilling of Plaintiff Interceptor.

55.    In February 2013, the Division completed its audit.  In a letter dated February 8, 2013, the Division, through its Deputy Commissioner and Director Robert Maccarone, stated: "[T]he audit found that Interceptor continues to have a very significant, albeit contested, financial obligation to AT&T, and that this financial obligation has now been referred to a collection agency.  You have not provided written adequate assurances that the AT&T obligation is erroneous or, in the event that it is not, that a mutually acceptable forbearance agreement has been negotiated or posted an irrevocable bond or Standby Letter of Credit.  Until it is resolved, Interceptor's outstanding financial obligation prevents the Division from finding that Interceptor is free of significant Vendor Responsibility issues. . . . Until such time as you have provided DCJS written documentation that the AT&T issue has been resolved in a manner satisfactory to DCJS, this agency will not . . . reinstate your company as a Qualified Manufacturer of Ignition Interlock Devices in the State of New York."

23

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

56. On April 26, 2013, the Division terminated Plaintiff Interceptor's contract with the State. By letter of the same date, Deputy Commissioner Maccarone stated: "[Y]our business is still faced with a reported AT&T debt of approximately $600,000 . . . As you know, your contract with the State has significant public safety implications. Failure to maintain real time reporting or proper service maintenance and other data reporting associated with an Ignition Interlock device can result in life threatening highway accidents involving drivers which could be avoided with law enforcement intervention. Further, Interceptor's continued debt obligation to AT&T detrimentally affects Interceptor's potential solvency and ability to maintain service delivery as required."

57. On September 4, 2013, the DOH revoked the certification of the Plaintiff Interceptor's Interlock, attributing its revocation to (1) the failure of Plaintiff's Interceptor's Interlocks to function properly in April 2012 due to the "inability to transmit real time data" and (2) Plaintiff Interceptor's "violation" of its contract with State "through a reported debt to AT&T of approximately $600,000. Interceptor delayed notification to DCJS of this debt and claimed it was not at fault. Failure to resolve this debt placed Interceptor in a position of questionable solvency."

58. As noted above, the Plaintiff's Interlocks lost their ability to transmit real time data in April 2012 because AT&T improperly terminated the Services to Plaintiff Interceptor on March 27, 2012, without notice and in reckless disregard of public safety. In addition, the alleged "debt" to AT&T cited by both the Division and the DOH was not a debt at all, and was the simply the fictitious amount AT&T claimed was past due in the invoice for the billing period ending April 25, 2012.

24

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

59.     As a result of the termination of its contract with the State and the revocation of its DOH certification, Plaintiff Interceptor's business was destroyed.  It could no longer sell Interlocks in New York and the certification of the Interlock in other states was revoked.  As a result of New York State's suspension and revocation, Plaintiff Interceptor lost the authority to do business in Minnesota, New Jersey, Kansas, Vermont, and cancelled its plans to expand into Texas and several other states.   This decimated Plaintiff Interceptor's ability to generate revenue and to function as a going concern.  Plaintiff Interceptor soon ceased operations.

60.     The damages to Plaintiff Interceptor directly and proximately caused by AT&T's breach of its legal and contractual duties include, but are not limited to, actual and compensatory damages, special and consequential damages (including lost profits) of an amount to be determined at trial but which, upon information and belief, exceed $10 million.

### FIRST CAUSE OF ACTION
#### (Breach of Contract)

61.     Plaintiff realleges and incorporates by reference paragraphs 1 through 60 above as if set forth fully herein.

62.     Defendant AT&T agreed to provide the Services to Plaintiff Interceptor pursuant to the rates and under the terms provided in the Pooled Data Plan subscribed to by Plaintiff Interceptor as alleged above.

25

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

63.     Plaintiff Interceptor made full and complete payment for the Services at the rates and pursuant to the terms agreed to by the parties as provided in the Pooled Data Plan alleged above.

64.     Defendant AT&T improperly terminated its provision of the Services to Plaintiff Interceptor on or about March 27, 2012, without any notice to Plaintiff Interceptor and without any legal or contractual justification.

65.     Defendant AT&T issued false and erroneous invoices for the Services claiming amounts past due that were fictitious and inconsistent with the rates agreed to by the parties as provided in the Pooled Data Plan.

66.     By issuing erroneous and false invoices, demanding payment for amounts past due that were fictitious and by terminating the provision of Services to Plaintiff Interceptor without notice, Defendant AT&T breached the agreement of the parties.

67.     As a direct and proximate cause of the breaches by Defendant AT&T, Plaintiff Interceptor has been damaged in an amount not less than $10 million, including actual damages, special damages, consequential damages and lost profits.

## SECOND CAUSE OF ACTION
### (Breach of Duty of Good Faith and Fair Dealing)

68.     Plaintiff realleges and incorporates by reference paragraphs 1 through 67 above as if set forth fully herein.

69.     Defendant AT&T owed Plaintiff Interceptor a duty to act in good faith and conduct fair dealing in connection with its provision of the Services to Plaintiff Interceptor. This duty, while not express in the agreement between the parties, is implied in every

26

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM
NYSCEF DOC. NO. 1

INDEX NO. 651398/2018
RECEIVED NYSCEF: 03/23/2018

contract under New York law. Here, among other duties, Defendant AT&T had a duty to invoice Plaintiff Interceptor accurately, and in good faith, for the Services contracted for by Plaintiff Interceptor. This duty included, among other things, an obligation by Defendant AT&T to issue invoices that correctly reflected the amount that AT&T claimed was currently due and was past due for its provision of the Services to Plaintiff Interceptor. Defendant AT&T also had a duty to provide reasonable notice of its termination of the Services, particularly given the potential harm to public safety that could result from immediate termination of the Services without notice.

70.    Defendant AT&T, as alleged above, repeatedly issued invoices to Plaintiff Interceptor that claimed amounts due that were inaccurate, false and erroneous. Defendant AT&T, by issuing invoices that made false claims for amounts past due, including but not limited to the invoice for the billing period ending April 25, 2012 which falsely and erroneously claimed Plaintiff Interceptor owed AT&T the amount of $570,832.47 for past due services, breached its duty of good faith and fair dealing. Furthermore, Defendant AT&T's entire course of conduct in billing Plaintiff Interceptor for the Services, and its reckless suspension of the Services without legal or contractual justification was a breach of its duty of good faith and fair dealing. Additionally, by terminating the Services without any notice (much less reasonable notice) AT&T breached its duty of good faith and fair dealing.

71.    Defendants AT&T's breach of its duties directly and proximately caused Plaintiff Interceptor damages, including, but not limited to, the cancellation of its contract with New York State and the revocation of its certification by the DOH. As a direct and

27

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

proximate result of the breaches by Defendant AT&T, Plaintiff Interceptor has been damaged in an amount not less than $10 million, including actual damages, special damages, consequential damages and lost profits.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant as follows:

A. Actual and compensatory damages of an amount to be determined at trial and which, upon information and belief, exceed $10 million;

B. Special and consequential damages, including lost profits, of an amount to be determined at trial and which, upon information and belief, exceed $10 million; and

C. For such other and further relief as is equitable and just.

Dated: New York, New York
March 23, 2018

> O'Reilly Stoutenburg Richards LLP
> 32 East 57th Street, 8th Floor
> New York, NY 10022
> T: (212) 419-9880
> F: (212) 812-3328
> mark@osrlaw.com
>
> By: _____
> Mark W. Stoutenburg
> Michael S. O'Reilly
>
> *Attorneys for Plaintiff*

28

FILED: NEW YORK COUNTY CLERK 03/23/2018 10:39 AM

NYSCEF DOC. NO. 1

INDEX NO. 651398/2018

RECEIVED NYSCEF: 03/23/2018

## VERIFICATION

STATE OF NEW YORK   :

                                        ss:

COUNTY OF SUFFOLK   :

        I, John Ruocco, am Chief Executive Officer of the Plaintiff Interceptor Ignition

Interlocks, Inc. in the within action. I have read the foregoing complaint and know the

contents thereof. The contents are true to my own knowledge except as to matters therein

stated to be alleged upon information and belief, and as to those matters I believe them to

be true.

                                                            _____
                                                            John Ruocco

Subscribed to and sworn before me on
23 day of March 2018.


_____
Notary Public

DENISE STURIANO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ST6193080
Qualified in Suffolk County
My Commission Expires 09-08-2020

 

# NYSCEF - New York County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court cases. The NYSCEF site has received your electronically filed documents for the following case.

### Index Number NOT assigned

### Interceptor Ignition Interlocks Inc. - v. - AT&T Mobility Services LLC

### Assigned Judge: None Recorded

## Documents Received on 03/23/2018 10:39 AM

| Doc # | Document Type | Motion # |
|---|---|---|
| 1 | SUMMONS + COMPLAINT | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

Name:   **Mark William Stoutenburg**
Phone #:
Fax #:

E-mail Address:   **mark@osrlaw.com**
Work Address:   **32 E 57th St FL 8**
**New York, NY 10022**

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 03/23/2018 10:39 AM :

**STOUTENBURG, MARK WILLIAM - mark@osrlaw.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court
Phone: 646-386-5956    Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center - EFile@nycourts.gov**
**Phone: (646) 386-3033 · Fax: (212) 401-9146 · Website: www.nycourts.gov/efile**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK
-------------------------------------------------------------------x

INTERCEPTOR IGNITION INTERLOCKS INC.,

Plaintiff/Petitioner,

- against -                                                 Index No. 651398/2018

AT&T MOBILITY SERVICES LLC

Defendant/Respondent.
-------------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING

PLEASE TAKE NOTICE that the matter captioned above has been commenced as an electronically filed case in the New York State Courts Electronic Filing System ("NYSCEF") as allowed by CPLR § 2111 and Uniform Rule § 202.5-b (consensual electronic filing). This notice is being served as required by that rule.

NYSCEF is designed for the electronic filing of documents with the County Clerk and the court and for the electronic service of those documents, court documents, and court notices upon counsel and unrepresented litigants who have consented to electronic filing.

Electronic filing offers significant benefits for attorneys and litigants, permitting papers to be filed with the County Clerk and the court and served on other parties simply, conveniently, and quickly. NYSCEF case documents are filed with the County Clerk and the court by filing on the NYSCEF Website, which can be done at any time of the day or night on any day of the week. The documents are served automatically on all consenting e-filers as soon as the document is uploaded to the website, which sends out an immediate email notification of the filing.

The NYSCEF System charges no fees for filing, serving, or viewing the electronic case record, nor does it charge any fees to print any filed documents. Normal filing fees must be paid, but this can be done on-line.

1) **Parties represented by an attorney:** An attorney representing a party who is served with this Notice must promptly either consent or decline consent to electronic filing and service through NYSCEF for this case. Attorneys registered with NYSCEF may record their consent electronically in the manner provided at the NYSCEF site. Attorneys not registered with NYSCEF but intending to participate in e-filing must first create a NYSCEF account and obtain a user ID and password prior to recording their consent by going to www.nycourts.gov/efile. Attorneys declining to consent must file with the court and serve on all parties of record a declination of consent.

2) **Parties not represented by an attorney: Unrepresented litigants are exempt from e-filing. They can serve and file all documents in paper form and must be served with all documents in paper form.** However, an unrepresented litigant may consent to participate in e-

filing.

For information on how to participate in e-filing, unrepresented litigants should contact the appropriate clerk in the court where the action was filed or visit www.nycourts.gov/efile-unrepresented. Unrepresented litigants also are encouraged to visit www.nycourthelp.gov or contact the Help Center in the court where the action was filed. An unrepresented litigant who consents to e-filing may cease participation at any time. However, the other parties may continue to e-file their court documents in the case.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: April 12, 2018

Mark W. Stoutenburg
Name

32 East 57th Street, 8th Floor
Address

O'Reilly Stoutenburg Richards LLP
Firm Name

New York, NY 10022

MARK@OSRLAW.COM
E-Mail

(212) 419-9880
Phone

To: AT&T Mobility Services LLC

77 Water Street

New York, NY 10005

12/14/17

Index No.                    Page 2 of 2                    EF-3

Index Number: 651398/18

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

INTERCEPTOR IGNITION INTERLOCKS INC.,

Plaintiff,

-against-

AT&T MOBILITY SERVICES LLC,

Defendant.

---

## SUMMONS AND COMPLAINT

O'REILLY STOUTENBURG RICHARDS LLP
*Office and Post Office Address*
32 EAST 57th STREET, 8th FLOOR
NEW YORK, NEW YORK 10022
T: (212) 419-9880
Fax: (212) 812-3328

---

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney duly admitted to practice before the courts of this state, certifies that upon information and belief and reasonable inquiry, the contentions contained in the annexed documents are not frivolous.*

To

*Attorney(s) for the Defendant*

*Mark W. Stoutenburg, Esq.*
*Dated: March 23, 2018*

*Please take notice:*
NOTICE OF ENTRY
*that the within is a (certified) true copy of a*
*duly entered in the office of the clerk of the within named court on*

NOTICE OF SETTLEMENT
*that an order*
*settlement to the HON.*                    *of which the within is a true copy will be presented for*
*of the within named court at*                    *one of the Judges*
*on the      day of          2015 at      M.*

*Dated,*                    *Yours, etc.,*

O'REILLY STOUTENBURG RICHARDS LLP
*Attorneys for Plaintiff*
*Office and Post Office Address*
32 EAST 57th STREET, 8th FLOOR
NEW YORK, NEW YORK 10022
T: (212) 419-9880
Fax: (212) 812-3328

2018041800151

2018041800155

