UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERCEPTOR IGNITION INTERLOCKS INC., | Civil Action No. 1:18-cv-04289-KBF |
| Plaintiff, | **DECLARATION OF JOHN RUOCCO** |
| - against - | |
| AT&T MOBILITY SERVICES LLC, | |
| Defendants. | |

**JOHN RUOCCO**, hereby declares:

1. I am the President of plaintiff Interceptor Ignition Interlocks Inc. ("Interceptor"), and I submit this declaration in opposition to the motion of Defendant AT&T Mobility Services LLC ("AT&T") to compel arbitration, or alternatively, for dismissal of the Verified Complaint (the "Motion").

2. As detailed in the Verified Complaint, Interceptor contracted with AT&T to provide "subscriber identification module cards" ("SIM cards") and wireless telecommunication services (collectively the "Services"), which were incorporated into a wireless modem connected to Interceptor's ignition interlock devices, beginning in 2004. Interceptor's ignition interlocks were leased to its customers and the customers paid Interceptor a monthly fee, which included their proportionate share for the cost of the Services.

3. The primary factual assertion underlying AT&T's Motion to compel arbitration – that the 2008 Corporate Advantage ("CDA") agreement cited by AT&T governs the Services that are the subject of this action – is simply wrong. The CDA

1

agreement related to Interceptor's corporate mobile phone plan with AT&T, which was entirely unrelated to the Services and for which there never was a written contract with AT&T, as alleged in the Verified Complaint.

4.  AT&T's corporate representative, Glen Cooper, who does not claim to have any personal knowledge of Interceptor's relationship with AT&T, and whose declaration is based entirely on his review of documents and AT&T records, asserts that: (1) AT&T does not provide services without a written contract, and (2) AT&T could only find the CDA agreement when it searched its records. Accordingly, he concludes, the CDA must have been the agreement governing the Services described in the Verified Complaint. Cooper ¶ 9. This conclusion is not correct because it ignores several key facts and the very language of the CDA agreement itself, which makes plain that the CDA agreement had nothing to do with the Services and instead was intended to govern Interceptor's corporate mobile phone plan.

5.  First, as alleged in the Verified Complaint, Interceptor first contracted with AT&T to provide the Services in 2004. The CDA agreement was not executed (according to AT&T) until 2008. Thus, according to AT&T, their records show that there was no written agreement at all in place between the parties until 2008. Cooper ¶ 11. This puts the lie to the assertion that AT&T did not ever provide wireless services without a written agreement, as claimed by Cooper (¶ 4). This was definitively the case between the parties for a period of at least four years.

6.  Second, while I have no recollection of agreeing to the CDA agreement electronically by telephone (as AT&T alleges), the plain language of the CDA agreement makes clear that it related to our corporate mobile phone program and not the Services

that are the subject of the Verified Complaint. I will address each of the relevant provisions of the CDA in turn.

7.     To start, the counterparty to the CDA was not Defendant, but an entity called "AT&T Mobility National Accounts LLC." The Defendant in this action is AT&T Mobility Services LLC. AT&T does not explain, much less establish, why the CDA is relevant to Interceptor's claims against Defendant in this case. To be clear, the entity that provided Services to Interceptor at issue in the Verified Complaint was defendant AT&T Mobility Services LLC, as reflected in the 2011 Settlement Agreement (discussed below).

8.     Next, the entirety of the CDA agreement makes clear that its purpose was to provide discounts to AT&T's customers depending on the volume of the customer's mobile phone usage for both itself and its employees. Cooper Ex. 2, para. 3.2. For example, it states that AT&T will provide services to "Customer, its Affiliates and their respective Employees." Cooper Ex. 2, para. 1. Employees could receive services as "corporate responsibility users" or as "individual responsibility users." *Id*. This has nothing to do with the Services described in the Verified Complaint, and instead relates to Interceptor's corporate mobile phone plan for its employees. Indeed, there is no reference at all in the CDA Agreement to "Pooled Data Plan" services or "Pooled Telemetry Connect" services which is how AT&T described the Services it provided to Interceptor in hundreds of communications. Similarly, the CDA agreement provides for discounts on certain equipment used by the customer and its employees. But Interceptor never purchased any equipment from AT&T for the Services and was provided, at no cost, with SIM cards to incorporate into the ignition interlock devices that it manufactured and leased to its end users. Likewise, the CDA agreement provides that

Interceptor would be provided with "WIN Advantage Software" and would be billed for this software. Cooper Ex. 2, para. 7.1. But AT&T never provided Interceptor with any software and did not bill Interceptor for any software. There are multiple provisions of the CDA agreement that address what services do and not qualify for discounts and elaborate provisions governing how the discounts are triggered. But Interceptor never received any "discounts" for the Services and was billed and charged (usually incorrectly) for the Services without any reference to the discount program set forth in the CDA Agreement.

9. Perhaps most critically, the CDA Agreement that AT&T relies on prohibits the resale and other prohibited uses of the Services. Cooper Ex. 2, para. 10. The CDA Agreement states: "Customer, its Affiliates (if applicable) and their respective CRUs are not permitted to resell, reproduce, retransmit, or disseminate service or any other program components to third parties whether directly or indirectly, including without limitation, through machine-to-machine transmissions." And yet, even though this was prohibited by the CDA Agreement, that is *exactly* how Interceptor deployed the Services it purchased from AT&T. The SIM cards provided by AT&T were installed in Interceptor's ignition interlock devices and the Services were used by third parties (its customers). Effectively, Interceptor was reselling the Services to its customers. And Interceptor's method of using the Services was no secret, since AT&T actively promoted Interlock's use of the Services at public events and in a national press release, presumably for its own benefit. See attached Exhibit 1.

10. Third, in its 2011 Settlement Agreement with Interceptor, AT&T made no reference to the CDA Agreement, and instead referred to the "Pooled Telemetry Connect

Service Agreement" in relation to the Services at issue in the Verified Complaint. As detailed in the Verified Complaint, the parties executed a Release and Settlement Agreement (the "2011 Settlement Agreement") dated as of October 20, 2011, which provided for a credit to Interceptor in the amount of $517,455.23 for the period of November 3, 2010 to August 3, 2011. A copy of the 2011 Settlement Agreement is attached as Exhibit 2. AT&T eventually applied this credit to the invoice it issued to Interceptor for the billing period ending December 25, 2011. (The claims in this case relate to AT&T's conduct *after* the 2011 Settlement Agreement and are therefore not covered by the 2011 Settlement Agreement).

11.  The 2011 Settlement Agreement, which was drafted by AT&T's lawyers, was executed on behalf of defendant AT&T Mobility Services LLC and states, in relevant part:

> AT&T shall credit the amount of $517,455.23 as full and final resolution of the Dispute based on the CUSTOMER promise to satisfy the following conditions: (1) execution of the AT&T Machine to Machine Wireless Communications Agreement and (2) bringing all active Pooled Telemetry Connect wireless devices under the **Pooled Telemetry Connect Service Agreement** to AT&T for updating on or before February 28, 2012. . . . This Release and Settlement does not affect the provision of the Pooled Telemetry Connect Service so long as wireless devices are under this Service.

Exhibit 2 at sections 1 and 2 (emphasis added).

12. Thus, in 2011 AT&T's position was that the Services at issue in the Verified Complaint were provided pursuant to a "Pooled Telemetry Connect Service Agreement." Now it contends that these same Services were governed by the CDA Agreement, a position it appears to now be taking solely because of this litigation. I understand that Interceptor's lawyers in this case voluntarily provided a copy of the 2011 Settlement Agreement to AT&T's lawyers before AT&T filed its Motion.

13. I do not recall a written Pooled Telemetry Connect Service Agreement, and no written agreement was exhibited to the 2011 Settlement Agreement. My understanding both then and now is that this was a reference to the agreement that was evidenced by the parties' course of conduct and dealings, which by then had been in place for approximately seven years.

14. By the time the 2011 Settlement Agreement was executed, Interceptor had already executed the "AT&T Machine to Machine Wireless Communications Agreement," thereby fulfilling one of the conditions referred to in the 2011 Settlement Agreement. In June 2011, Interceptpr's representative at AT&T recommended that Interceptor move to an Enterprise on Demand ("EOD") model. According to AT&T's June 20, 2011 letter, this would allow Interceptor "complete control over all [its] activations as well as discount the price even further . . . . In addition, EOD will allow you to cancel lines when needed with no penalties or termination fees." A copy of the letter is attached as Exhibit 3. Under the AT&T proposal, Interceptor would place one last order for 100 lines under the Pooled Data Plan before moving to the EOD platform.

15. Consistent with AT&T's representations, on August 17, 2011, I executed the "AT&T Machine to Machine Wireless Communications Agreement" on behalf of

Interceptor. This agreement provided for 25MB of data for $9.99 per month per line, a significant savings over the existing Pooled Data Plan subscribed to by Interceptor. However, we never received any wireless services from AT&T pursuant to this agreement, and for the remainder of our relationship with AT&T we stayed on the existing Pooled Data Plan for the Services. Upon information and belief, AT&T did not migrate Interceptor to the EOD platform, and we never received this lower pricing, because of AT&T's various technical problems and bureaucratic delays.

16. The plan was that Interceptor would migrate to the EOD platform, but that never happened and shortly thereafter AT&T terminated the Services without notice, giving rise to this action. Thus, it is my understanding and belief that the claims in this action arise under the agreement of the parties as fully detailed and alleged in the Verified Complaint, and no other agreement, and certainly not the CDA agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 30, 2018.

*/s/ John Ruocco*
John Ruocco

# EXHIBIT 1

## Interceptor Ignition Interlocks Inc. and AT&T Unite to Help Make Roads Safer

Shirley, New York, March 4, 2010

According to the U.S. Dept of Transportation, National Highway Traffic Safety Administration, 32 people in the United States die every day in motor vehicle crashes involving an alcohol-impaired driver, amounting to one death every 45 minutes[1]. Further, roughly one-third of all drivers arrested or convicted of driving under the influence (DUI) are repeat offenders[2].

Interceptor Ignition Interlocks Inc. has teamed up with AT&T* to help prevent drunk driving, particularly to prevent convicted DUI offenders from repeat occurrences of driving while intoxicated. The company has introduced Interceptor, a Breath Alcohol Ignition Interlock Device (BAIID) that measures Breath Alcohol Concentration (BAC) in vehicles and uses AT&T's wireless network to transmit the recorded results. The ability to wirelessly transfer data in real-time is a patented feature exclusive to the Interceptor product line.

Under an agreement with AT&T, Interceptor Ignition Interlocks Inc. has installed AT&T SIM cards into its Interceptor devices to support real-time transfer of recorded in-vehicle data to local police or designated probation officers. Here's how it works: every time a driver previously convicted of driving while intoxicated operates a vehicle equipped with the Interceptor, the driver's name, date, time, BAC reading, photo and current GPS location are transmitted to the probation or court Web site in real-time, enabling the monitoring officer to view vehicle activity 24 hours a day, 365 days a year. This data is sent across AT&T's wireless network and reported to officials via an AT&T Central Information Portal.

The Interceptor requires drivers to be tested before starting the vehicle and periodically throughout the duration of the drive. If at any time the test indicates legal limits have been exceeded, the Interceptor will either prevent the car from starting, or will deliver an automated voice prompt to the driver to turn off the engine. In the event a driver does not shut off the vehicle's engine, the Interceptor triggers a series of events: the car's lights flash; the car's horn is activated continuously; the local 911 police emergency response dispatcher is alerted via the central information portal; and the dispatcher directs police to intercept the targeted vehicle immediately.

"We designed this device to detect blood alcohol levels in the breath of drivers previously convicted of driving while intoxicated and to ensure that violators are instantly and simultaneously reported to authorities and prevented from operating their vehicle," said John Ruocco, CEO of Interceptor Ignition Interlocks Inc. "The ultimate success of any Interceptor Ignition Interlocks solution depends on having a strong communications network that has real-time reporting capabilities to ensure quick action can be taken when violations occur. AT&T's wireless solutions and network were the clear choice for us and we look forward to working together to help keep drunk drivers off the road."

The Interceptor device is typically court-ordered for drivers who have a previous DUI conviction. However, with the enforcement of Leandra's Law, which goes into effect in August 2010, first-time offenders in New York will be mandated by the court to install an ignition interlock device in their vehicle. The Interceptor can also be used proactively by private businesses such as taxi, limousine and trucking companies to monitor all commercially licensed drivers. New and young drivers can also be monitored by parents and guardians using a "parental control" option.

Small businesses and organizations looking to find information about AT&T products and services can visit www.att.com/smallbusiness. For free resources such as webinars, white papers, training, case studies and best practices, they can visit www.att.com/smallbusinessinsite. Further information can be found on the AT&T Small Business Facebook page (www.facebook.com/ATTSmallBiz) and Twitter channel (www.twitter.com/smallbizInSite).

*AT&T products and services are provided or offered by subsidiaries and affiliates of AT&T Inc. under the AT&T brand and not by AT&T Inc.

[1] Dept of Transportation (US), National Highway Traffic Safety Administration (NHTSA). Traffic Safety Facts 2008: Alcohol-Impaired Driving. Washington (DC): NHTSA; 2009. Available at URL: http://www-nrd.nhtsa.dot.gov/Pubs/811155.PDF

[2] Dept of Transportation (US), National Highway Traffic Safety Administration (NHTSA).

Traffic Safety Facts 2004: Repeat Intoxicated Driver Laws. Washington (DC). Available at URL: http://www.nhtsa.dot.gov/people/injury/new-fact-sheet03/RepeatIntoxicated.pdf

**About AT&T**
AT&T Inc. (NYSE:T) is a premier communications holding company. Its subsidiaries and affiliates – AT&T operating companies – are the providers of AT&T services in the United States and around the world. With a powerful array of network resources that includes the nation's fastest 3G network, AT&T is a leading provider of wireless, Wi-Fi, high speed Internet and voice services. AT&T offers the best wireless coverage worldwide, offering the most wireless phones that work in the most countries. It also offers advanced TV services under the AT&T U-verse$^{SM}$ and AT&T |DIRECTV$^{SM}$ brands. The company's suite of IP-based business communications services is one of the most advanced in the world. In domestic markets, AT&T's Yellow Pages and YELLOWPAGES.COM organizations are known for their leadership in directory publishing and advertising sales. In 2009, AT&T again ranked No. 1 in the telecommunications industry on FORTUNE® magazine's list of the World's Most Admired Companies.

© 2010 AT&T Intellectual Property. All rights reserved. AT&T, the AT&T logo and all other marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies.

Additional information about AT&T Inc. and the products and services provided by AT&T subsidiaries and affiliates is available at http://www.att.com. This AT&T news release and other announcements are available at http://www.att.com/newsroom and as part of an RSS feed at www.att.com/rss. Or follow our news on Twitter at @ATTNews. Find us on Facebook at www.facebook.com/ATT to discover more about our consumer and wireless services or at www.facebook.com/ATTSmallBiz to discover more about our small business services.

## Additional Information

**Related News Releases:**

AT&T Supports More Than 370 Wireless Specialty Devices

**Related Media Kits:**

Wireless Networks

**Web Sites:**

AT&T Web Site
AT&T Wireless Web Site
Interceptor USA Web Site

## News Sources

AT&T Newsroom
RSS News Releases
RSS Podcasts
AT&T News

AT&T Newsroom
RSS News Releases
RSS Podcasts
AT&T News

# EXHIBIT 2

# RELEASE AND SETTLEMENT AGREEMENT

This document is a Release and Settlement Agreement (the "Agreement") between AT&T Mobility Services, LLC ("AT&T") and INTERCEPTOR IGNITION INT ("CUSTOMER").

## Recitals

WHEREAS, CUSTOMER subscribes to AT&T Pooled Telemetry Connect Service ("Service") offered by AT&T on Account Number 02524237 (the "Account");

WHEREAS, a dispute has arisen concerning the billing and payment of Data Overage Charges and Monthly Recurring Charges totaling $517,455.23 on the Account from November 3, 2010 to August 3, 2011 (the "Dispute");

WHEREAS, CUSTOMER continues to take AT&T Pooled Telemetry Connect Service after resolution of the Dispute and is responsible for all charges associated with the Service;

WHEREAS, AT&T and CUSTOMER now wish to resolve the Dispute; and

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, AT&T and Customer, intending to be bound by this Agreement, hereby agree as follows:

### 1. Credit by AT&T

AT&T shall credit the amount of $517,455.23 as full and final resolution of the Dispute based on the CUSTOMER promise to satisfy the following conditions: (1) execution of the AT&T Machine to Machine Wireless Communications Agreement and (2) bringing all active Pooled Telemetry Connect wireless devices under the Pooled Telemetry Connect Service Agreement to AT&T for updating on or before February 28, 2012. The amount of the credit may be subject to adjustment due to the applicability of Regulatory Fees and Taxes, in full settlement of the Dispute.

### 2. Outstanding Balance

CUSTOMER remains liable for all outstanding balances owed after the credit is applied and all future amounts owed related to use of the AT&T Pooled Telemetry Connect Service. This Release and Settlement does not affect the provision of the Pooled Telemetry Connect Service so long as wireless devices are under this Service.

gs – 11/12/10

### 3. Release

As part of the resolution of the Dispute, CUSTOMER knowingly and voluntarily releases AT&T from any type of further liability or claim, whether judicial, administrative, or otherwise, regarding the Dispute. CUSTOMER acknowledges that this Agreement expressly gives up every right CUSTOMER has regarding the Dispute.

### 4. Entire Agreement Regarding the Dispute

This Agreement is the entire and complete agreement of the parties regarding the resolution of the Dispute. There are no other agreements or promises that have not been stated in this Agreement. The parties have negotiated this Agreement, and these negotiations have been superseded by this Agreement. However, this Agreement is not intended to, and shall not, modify the terms of the CUSTOMER's Master Agreement with AT&T.

### 5. Ownership of Claim

Each party represents to the other party that it owns the claims asserted here. Those claims have not been assigned or transferred to anyone else.

### 6. No Admission of Liability

The parties enter into this Agreement to resolve the Dispute. Neither party admits liability for the claims asserted by the other party.

### 7. Legal Counsel

Each party represents that, in the negotiation and execution of this Agreement, it had the opportunity to consult a lawyer. Prior to the execution of the Agreement, the party's attorney, if any, reviewed the Agreement and made any desired changes or recommendations.

### 8. Applicable Law

If this Agreement requires interpretation according to established legal principles, the parties agree that this Agreement shall be construed in accordance with New York law in effect as of the date the Agreement is executed.

### 9. Enforcement of Agreement

While the parties intend to perform their respective obligations in good faith, it may become necessary for one party to bring a lawsuit to enforce or interpret the provisions of this Agreement. If such a lawsuit is brought, the prevailing party shall be entitled to all of

gs – 11/12/10

its costs in prosecuting or defending this lawsuit, including a reasonable amount of its attorney's fees.

## 10. Confidentiality

This Agreement, and the terms and existence hereof, constitute the confidential and proprietary information of each party. The parties agree to keep this Agreement, and the terms and existence hereof, confidential. Neither party shall disclose such information to others, unless required by a Court or regulatory agency of competent jurisdiction, and then, only upon prior written notice to the other party. If asked about the Dispute, each party may respond that the Dispute has been resolved to its satisfaction.

## 11. Miscellaneous

(a) If a party delays or fails to exercise a right it has under this Agreement or, alternatively, fails to strictly enforce any breach or default that shall not constitute a waiver of the other party's obligation to perform its obligations under this Agreement. Similarly, if a party excuses a breach or default on one occasion that shall not mean the other party is excused in the future from performing that obligation unless the excusing party states this in writing.

(b) If a court rules that any provision of this Agreement is invalid or unenforceable, the remaining provisions shall nevertheless continue in full force.

## 12. Counterparts

This Agreement may be signed in counterparts, which together will constitute the original Agreement.

## 13. AT&T Countersignature

AT&T may countersign this Agreement either by hand or electronically.

IN WITNESS WHEREOF, the parties have duly executed and agreed to be bound by this Agreement by the signatures of their authorized representatives below. Each party represents and warrants that the person executing this Agreement on its behalf is fully authorized.

Agreement is VOID if not signed by 11/1/2011*

AT&T Mobility Services, LLC

By: _____

INTERCEPTOR IGNITION INT

By: _____

gs – 11/12/10

(Authorized AT&T Signature)　　　　(Authorized CUSTOMER Signature)

_Gary Smith VP_　　　　　　　　　　_John Ruocco CEO_
(Typed or Printed Name and Title)　　(Typed or Printed Name and Title)

Date: 10/26/11　　　　　　　　　　Date: 10/14/11

This Agreement is not accepted until signed by CUSTOMER and AT&T
*This date may be extended only upon the parties' mutual agreement.

gs – 11/12/10

# EXHIBIT 3



Rethink Possible

June 20, 2011

Hi John,

Per our discussion, please see the below.

As of today, the balance on your account is $470,049.28. You made another good faith payment yesterday of $20,000.00 which you have been making month over month and I thank you for that as we work towards a resolution. This leaves a balance of $450,049.28.

We are diligently working on a substantial credit for you.

You currently have 1516 active lines on your AT&T account. After the comparison between the active lines on your AT&T account and the recent eligibility of lines that can be cancelled due contract expiration as of June 30th, 2011 I am able to cancel 524 lines. This will bring your account down to 992.

Also, as discussed, we will be moving Interceptor to EOD (Enterprise on Demand). This will give you complete control over all your activations as well as discount the price even further. The discounted price is unknown as they are all customized and will be determined by EOD. In addition, EOD will allow you to cancel lines when needed with no penalties or termination fees.

Once the credit has been determined, approved and applied, you have agreed to place one last order prior to moving to EOD for 500 new activations. AT&T in turn, will credit your account $100.00 per line equaling $50,000.00. This will be applied to your account 60 to 90 days after activation. I will do everything within my power to get this escalated for a more immediate bill posting.

If you have any further questions or require any additional information, please do not hesitate to contact me.

Thank you.

Sincerely yours,

*Joel B. Geller*

**Solutions Account Manager, AT&T Business Integrated Solutions**

Cell:   516.574.3903

Email: joel.geller@att.com